IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | § | |
| | § | |
| v. | § | Criminal Action No. **3:13-CR-465-L** |
| | § | |
| **JONATHAN BERRY (1) AND** | § | |
| **STANLEY BERNARD WILLIAMS (2)** | § | |

## MEMORANDUM OPINION AND ORDER

Before the court is Defendant's Motion to Suppress Unlawfully Obtained Evidence (Doc. 33), filed by Defendant Jonathan Berry on January 29, 2014; and Defendant's Motion to Suppress Unlawfully Obtained Evidence (Doc. 34), filed by Defendant Stanley Bernard Williams on January 31, 2014. After carefully considering the motions, response, briefing, evidence, applicable law, witness testimony at the hearing, and oral arguments by the parties during the hearing held on March 7, 2014, the court **grants** Defendant's Motion to Suppress Unlawfully Obtained Evidence (Doc. 33) and Defendant's Motion to Suppress Unlawfully Obtained Evidence (Doc. 34).

## I.    Factual and Procedural Background

Defendants Jonathan Berry ("Berry") and Stanley Bernard Williams ("Williams") (collectively, "Defendants") filed separate motions to suppress evidence that they contend was illegally obtained by Dallas police officers on October 28, 2013, as the result of unlawful investigative detentions and personal body frisks that occurred at the Tornado bus terminal in Dallas, Texas. While on duty on October 28, 2013, six plainclothes narcotics police officers from the Dallas Police Department were at the Tornado bus station, located in the city of Dallas, observing people in the passenger loading and unloading area. The six police officers are part of a drug interdiction squad that frequents transportation hubs throughout the city in an effort to intercept illegal drug

activity.  The officers included Sergeant Daniel Avalos, the squad supervisor, and Detectives Jesus

Martinez, Jason Cox, Samuel Hussey, Earnest Perez, and Joe Cerda, all of whom have extensive or

fairly extensive experience and training in narcotics and drug interdiction.  Detectives Martinez,

Cox, and Hussey, and Sergeant Avalos testified at the suppression hearing conducted on March 7,

2014.

Detectives Martinez and Cox first observed Williams and Berry as they came out of the bus

station together into the passenger loading zone area.  Williams and Berry flanked both sides of a

double door that opened and closed as people approached from inside and outside of the terminal.

Williams and Berry each had one small rolling suitcase ("bag").  Berry stopped about a foot away

from Detective Cox and leaned up against the wall.  Williams was a few feet away from Berry on

the other side of the double door. According to Detective Martinez, Williams nervously adjusted his

clothing, shuffled his feet, scanned the area, and made eye contact with Cox several times after

noticing that Cox was looking at him.  Berry also looked toward Detective Cox once and made eye

contact.  Williams then gestured to Berry with a head nod in the direction of the terminal.

Based on his observations of Berry and Williams in the bus loading area for slightly less than

two minutes, Detective Cox decided to engage them in a consensual encounter "[t]o see if they were

going to try to leave the location if they felt nervous because maybe they expected I was a police

officer." According to Detective Cox, the officers normally talk to so many people that they do not

know exactly what they are dealing with most of the time until they begin to talk to the person and

observe that person's reaction.  Because of Williams's head gesture, Detectives Cox and Martinez

believed that Williams and Berry might try to flee.

Berry and Williams did not flee as suspected by the officers.  Instead, they casually walked

back inside the bus station where Berry took off his coat and sat down, and Williams slowly walked

**Memorandum Opinion and Order – Page 2**

toward a main exit where he stopped a few feet outside the exit, turned and faced the bus terminal, and pulled out his cellular telephone as if to make a call. Detectives Martinez, Cox, and Hussey followed Williams outside while Detectives Perez and Cerda approached Berry inside the terminal. Sergeant Avalos remained inside the terminal and positioned himself where he could observe the detectives' interactions with Williams and Berry through the glass doors and wall panels.

Detectives Cox and Martinez initially approached Williams and flanked his front right and left sides while Detective Hussey initially positioned himself about ten feet behind Williams to provide "cover" for Detectives Cox and Martinez and make sure that no civilians came into the area where the detectives were talking to Williams.  As Detectives Cox and Martinez approached Williams, Detective Martinez pulled his badge from inside of his clothes to make it visible. Detective Cox verbally identified himself as a Dallas police detective, showed Williams his badge, and asked Williams whether he was willing to speak with him. Williams responded, "What did I do?" Detective Cox explained to Williams that he was with the narcotics division and that he and other detectives routinely talk to passengers regarding their travels and possessions in an effort to intercept illegal drug activity.  Detective Cox again asked Williams whether he was willing to speak with the detectives, and Williams agreed.

Detective Cox started out by asking Williams where he was traveling and asked to see his bus ticket.  In response, Williams reached into his pants pockets and retrieved an envelope that contained his and Berry's bus tickets, which were stapled together, as well as some plane tickets. Detective Cox returned the tickets to Williams and asked for identification.  Williams handed Detective Cox a passport with the name of Stanley Bernard Williams that he had retrieved from his pants pocket.  Unaware that Williams had previously handed him both bus tickets, Cox asked Williams why he was traveling under a false name and why the names on the passport and one of

the bus tickets did not match. Williams explained that he was traveling with his friend and again retrieved both tickets to show Detective Cox, who flipped through the tickets before handing them back to Williams.  From the court's review of the video, it shows that when Detective Cox returned the envelope that contained the tickets or identification to Williams, Williams took the items and held them in his left hand, but when he later turned over his bag to Detective Martinez, he moved the items to his right hand.  Detective Cox asked Williams who was his friend, and Williams gestured toward Berry, who was sitting inside the bus station.

Cox then asked Williams whether he would consent to the search of his bag, and Williams consented.  Williams then handed over the bag to Detective Martinez and stepped backwards slightly as Detective Martinez placed the bag on the ground in front of him with the rolling bag handle still extended.  According to Detectives Cox and Martinez, Williams looked over his shoulder as he stepped back.  Detectives Martinez and Cox and Sergeant Avalos testified that they thought Williams's looking over his shoulder was an indication that he might try to flee. Williams's attorney, on the other hand, took the position during the hearing that if Williams was looking over his shoulder and appeared nervous, it was because, as shown in the videotaped recording of the encounter, he was flanked by three police officers with Detectives Martinez and Cox on either side of him and Detective Hussey pacing back and forth closely behind him. The Government and police officers also disputed whether Williams was actually aware of Hussey's presence because he had not identified himself as a police officer and was positioned ten to fifteen feet behind Williams.

The video of the encounter clearly shows that, while Detective Cox was still looking at Williams's tickets or identification and before Williams handed over his bag to be searched, Detective Hussey moved in closer and was pacing back and forth approximately three or four feet behind and to the side of Williams and remained that close or closer before Williams was patted

down and wrestled to the ground.  Given that Detective Hussey was standing and at times pacing back and forth only a few feet behind and to the side of Williams, the court determines that a reasonable person would have seen Detective Hussey, or necessarily felt his presence, and would not have attempted to flee under the circumstances.  Moreover, it would not be out of the ordinary for a reasonable person, who was surrounded by three police officers, to feel some degree of nervousness, regardless of whether he or she was engaged in criminal activity.

According to Detectives Martinez and Cox, Williams had complied with their requests up to this point, but, after handing over the bag, he started to adjust his clothing and put his hands in his pocket.  For safety reasons, Detective Martinez ordered Williams to keep his hands out of his pockets.  When Williams put his hands in his pockets again, Detective Martinez took a "bladed" stance[1] by holding one hand on his holstered weapon while moving toward Williams and pointing at him with the other hand, ordering him to stop putting his hands in his pockets.  Detective Martinez then advised Williams that he was going to search[2] him for officer safety, and the situation quickly escalated from this point with the four officers (Sergeant Avalos and Detectives Martinez, Cox, and Hussey) quickly surrounding Williams, and the officers and Williams all raising their voices. According to Detective Martinez, Williams, who was agitated by now, responded, "You can search my bag, but you are not searching me!" and moved away from the officers when they approached to search him.  Detective Cox then told Williams again that he was going to be patted down for officer safety and to relax.  When Detective Martinez attempted to pat down Williams, Williams pulled away.  Detective Cox grabbed Williams's left wrist to restrain him while Detective Martinez

---

[1] Specifically, the court understands a "bladed" stance to be the defensive manner in which a police officer stands when he or she confronts a person believed to be a suspect.  In street parlance, the police officer is ready "to do battle" if the need arises.

[2] Detective Martinez used the term "search" and "pat-down" interchangeably when testifying that he told Williams the officers were going to conduct a pat-down of his person for officer safety.

conducted the pat-down. Detective Martinez immediately felt a square object on Williams's upper right thigh, and shouted out, "He's got something!"

Detective Martinez testified that he believed the "something" to be narcotics while Detective Cox and Sergeant Avalos, who had just exited the building to assist after observing the situation with Williams escalate, interpreted this to mean that Williams might have a weapon or contraband. According to Detective Martinez, "the fight was on," when Williams resisted the pat-down by attempting to pull away. Detective Cox performed a "straight arm bar takedown," and wrestled Williams to the ground. Williams landed on his right hand when he was wrestled to the ground and, according to the officers, refused to give his right hand in response to Detective Martinez's verbal commands. Sergeant Avalos drew his weapon and told Williams to comply.

There was conflicting testimony during the hearing whether Williams grabbed for his waist before or in the process of being taken to the ground. In any event, Detective Martinez and Sergeant Avalos testified that they were both concerned because they were unable to see Williams's right hand[3] when he was lying face down on the ground until the officers forcibly pulled his hand out

---

[3] During the hearing, Williams's counsel argued that the officers' testimony that Williams put his hands in his pockets and reached for his waist after turning over his bag was not credible because the video reflects that, just prior to being  searched and taken to the ground, Williams was still holding the tickets in his right hand. On cross-examination, defense counsel asked all of the officers whether Williams was still holding the tickets in his right hand that he had previously retrieved from his pockets in response to Detective Cox's inquiries about Williams's travel plans. Sergeant Avalos responded that he did not see that, and Detective Hussey said he had no idea whether Williams was holding the tickets in his right hand. Detective Cox was also unable to recall whether Williams was still holding the tickets in his right hand. Detective Martinez testified that he was unable to tell from the video whether Williams was still holding on to the tickets in his right hand.

For whatever reason, the four video excerpts that the Government obtained from the bus terminal and entered into evidence are all in color and clearly visible except for a portion of one video in which the officers approach Williams and eventually take him to the ground and handcuff him. As a result, the black and white portion of this video that was played during the suppression hearing is not as clear. By adjusting the video brightness and contrast settings slightly, however, the court was better able see the officers' interactions with Williams while they and Williams were still within view of the video recorder, which was directed at the main entrance of the bus terminal.

As previously noted, it does appear to the court, after carefully reviewing the video a number of times, that Williams took the tickets or identification from Detective Cox with his left hand and held them in his left hand until he handed over his bag, at which time, it appears that he moved the items to his right hand. Moreover, after Williams is handcuffed and pulled up from the ground, what appears to be tickets falls to the ground and is retrieved by one of the officers as Williams is escorted inside the terminal. In any event, as herein explained, while the issue of whether

**Memorandum Opinion and Order – Page 6**

from underneath him and handcuffed him.  Detective Martinez acknowledged that this was not the reason that he decided to pat down Williams.  The decision was instead made when Williams did not consent to and resisted Detective Martinez's attempt to pat him down.

After Williams was handcuffed, Detective Martinez finished patting down the exterior of Williams's clothing and felt additional packages. According to Detective Martinez, Williams was already under arrest at this point because he had resisted the pat-down.[4]  Sergeant Avalos similarly testified that Williams was arrested because he resisted detention and the pat-down search, and he believed Williams might have a weapon.  No weapons were ever found on Williams.  The entire encounter from the time the officers first observed Berry and Williams in the bus loading area to when Williams was forcibly taken to the ground and handcuffed lasted approximately six minutes. Detectives Cox and Martinez talked to Williams  for approximately two minutes before the decision was made to pat him down a short time after he handed over his bag to be searched.

Immediately following the altercation with Williams, Detective Cox went inside the bus station where Detectives Cerda and Perez had been talking to Berry.  At this point, Detective Cox did not know what was in the packages discovered on Williams.  Detective Cox explained to Berry

---

Williams put his hands in his pockets after handing over his bag is relevant to whether the officers had concern for their safety, it is not relevant to the court's determination of whether reasonable suspicion existed for the detention and *Terry* frisk.

[4] Detective Martinez is apparently referring to section 38.03(a) of the Texas Penal Code.  This section makes it an offense for one to use force against a peace officer to resist an arrest or search.  This section "contemplates resisting an effort to implement traditional arrest and not, as appellant argues, resisting an investigative detention or stop." *Molina v. State*, 754 S.W.2d 468, 474 (Tex. App.—San Antonio 1988, no writ).  The plain language of section 38.03(a) and the statutory definition of arrest clearly contemplate a "traditional arrest" as opposed to a detention. *Id.* Thus, the flaw in Detective Martinez's statement is that neither reasonable suspicion nor probable cause existed at the time referenced by him.  Moreover, absent reasonable suspicion or probable cause, an individual is free to ignore the police when approached. *Illinois v. Wardlow*, 528 U.S. 119, 125 (2000).  A "refusal to cooperate, without more, does not furnish the minimal level of objective justification needed for a detention or seizure." *Florida v. Bostick*, 501 U.S. 429, 437 (1991). The statement by Martinez puts Williams and any other person in a "no-win" situation, and the court does not embrace the notion that Williams was under arrest at the time he refused to cooperate with the pat-down that the officers intended to conduct.

how Williams had been in an altercation with the police officers and that Williams had been placed under arrest.  Detective Cox advised Berry that he was going to handcuff him and search his person for weapons.  Before patting him down, Detective Cox informed Berry that he was under arrest.[5] Berry did not consent to or resist the pat-down.  Detective Cox testified that he handcuffed Berry for safety reasons because he knew by this time that the two were traveling together and that Williams had resisted the officers.  He also testified that he was tired from wrestling with Williams and concerned because Berry is much larger in size than he is, and he was not sure whether Detectives Cerda and Perez were aware of what had just happened with Williams.  No weapons were found on Berry, but officers noted the presence of hard square-shaped packages in Berry's waist and leg area.  Prior to being handcuffed, Berry had similarly explained to Detectives Cerda and Perez that he was traveling to Ohio with his friend Williams, who was outside, and he had consented to the search of his bag.  Detectives Cerda and Perez searched Berry's bag but found nothing unusual.

The officers took Williams and Berry to another area of the bus terminal where they conducted a full search by opening up and removing Williams's and Berry's outer clothing.  The officers found several packages on both Defendants concealed underneath their clothing.  The packages were subsequently opened and tested at police headquarters for the presence of narcotics.  The test results revealed that the packages found on Williams's body consisted of approximately 3.5 kilograms of heroin and that the packages found on Berry's body consisted of approximately 2.4 kilograms of heroin.  Williams and Berry have remained in federal custody since October 29, 2013.

---

[5] This statement by Detective Cox is puzzling to the court, as probable cause had not been established to arrest Berry for a crime, and the police officers did not have a warrant for his arrest.

## II.     Legal Standard

In *Terry v. Ohio*, 392 U.S. 1 (1968), the Supreme Court held that an officer may conduct an investigatory detention and protective pat-down when he "observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot and that the persons with whom he is dealing may be armed and presently dangerous . . ." *Id*. at 30. Probable cause is not a prerequisite for a brief investigative detention; however, the police officer must have "reasonable suspicion supported by articulable facts that criminal activity 'may be afoot'" because the Fourth Amendment requires "some minimal level of objective justification" for making an investigative stop. *United States v. Sokolow*, 490 U.S. 1, 7 (1989) (citations omitted). "The officer . . . must be able to articulate something more than an inchoate and unparticularized suspicion or hunch." *Id.* (internal quotation marks omitted). In evaluating the validity of a stop, courts consider "the totality of the circumstances." *Id.* at 8 (citations omitted).

To justify a pat-down search, police officers must have reason to believe that the individual being investigated is armed and dangerous. *Terry*, 392 U.S. at 27. "The officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent [person] in the circumstances would be warranted in the belief that his safety or that of others was in danger." *Id.* (citations omitted). "[I]n determining whether the officer acted reasonably in such circumstances, due weight must be given, not to his inchoate and unparticularized suspicion or 'hunch,' but to the specific reasonable inferences which he is entitled to draw from the facts in light of his experience." *Id.* (citation omitted). "[E]vidence may not be introduced if it was discovered by means of a seizure and search which were not reasonably related in scope to the justification for their initiation." *Id*. at 29 (citation omitted).

The manner in which a search and seizure was conducted is an important part of the court's analysis in determining they were justified at all. *Id.* at 28. Because a pat-down is only justified to protect the police officer and others nearby, it must be "confined in scope to an intrusion reasonably designed to discover guns, knives, clubs, or other hidden instruments for the assault of the police officer." *Id.* Thus, a pat-down must be strictly limited to what is minimally necessary to learn whether the persons being investigated are armed and to disarm them if weapons are discovered. *Id.* at 30. It is not an invitation to "conduct a general exploratory search for whatever evidence of criminal activity [the officer] might find." *Id.*

## III.    Analysis

### A.    Defendants' Contentions

Defendants contend that the facts in this case did not justify the detention and search of their persons. Williams contends that the police officers did not have reasonable suspicion that he was engaged in criminal activity and his allegedly nervous conduct and reaching into his pockets did not justify the detention or support the Government's assertion that a body frisk was necessary for the officer's safety. Williams states that he was asked multiple times to retrieve items from his pockets, and if he was nervous, it was due to the hostile environment created by the police officers after he declined to allow a search of his person. Williams also contends that the police officer's search of his person exceeded the scope of what was necessary to determine whether he had any weapons on his person because the initial pat-down revealed only a square object in his pocket, not weapons. Williams therefore contends that all evidence seized as a result of the detention, search, and arrest should be excluded.

Berry contends that his detention and the search of his person were unlawful because they were based solely on the police officers' encounter with Williams, and there are no facts to

demonstrate that he needed to be immediately handcuffed for the police officers' safety.  Berry

contends that the police officers' decision to place him immediately in handcuffs was based solely

on the fact that he was traveling with a person who had just been arrested rather than any belief that

he might be armed or posed a danger.  Berry cites *Sibron v. New York*, 392 U.S. 40, 62-63 (1968),

for the proposition that "[a] person's mere propinquity to others independently suspected of criminal

activity does not, without more, give rise to probable cause to search that person."  Berry's Mot. 4.

He also contends that nervous behavior alone is insufficient to establish reasonable suspicion

necessary to justify an investigative detention.  *Id.* (citing *United States v. Jenson*, 462 F.3d 339 (5th

Cir. 2006), and *United States v. Santiago*, 310 F.3d 336 (5th Cir. 2002)).  Like Williams, Berry also

contends that the pat-down exceeded what was necessary to determine if he had any weapons. Berry

therefore requests the court to exclude all evidence obtained as a result of the detention, search, and

arrest.

### B.    The Government's Contentions

The United States ("Government") asserts that the police officers' initial encounters with

Williams and Berry were "consensual."  Government's Resp. 6.  According to the Government, a

consensual encounter occurs when an individual voluntarily  and willingly agrees to speak with a

police officer, and such encounters may be initiated by police without any objective level of

suspicion. The Government contends that the police officers' observations before and during the

consensual encounters with Williams and Berry "gave rise to reasonable suspicion that criminal

activity was afoot."  *Id.*  The Government further asserts that as the officers interacted with

Williams, they "reasonably feared he may be armed and dangerous."  *Id.*  The Government therefore

contends that Williams's actions justified a *Terry* stop and pat-down of his person.  For support, the

Government relies on the following cases, which it contends are factually similar to this case: (1)

*United States v. Sokolow*, 490 U.S. 1 (1989); (2) *United States v. Cooper*, 43 F.3d 140 (5th Cir. 1995); (3) *United States v. Sanders*, 994 F.2d 200 (5th Cir. 1993); and *United States v. Jordan*, 232 F.3d 447 (5th Cir. 2000).

The Government contends that the seizure of the heroin felt on Williams was proper because "[u]nder the 'plain feel' doctrine police officers may seize nonthreatening contraband detected during a protective pat down search of the sort permitted by *Terry*. Officers are not required to ignore contraband discovered during a legitimate *Terry* search." Government's Resp. 14 (citations omitted). According to the Government, "[Detective] Martinez informed the Government, based upon his training and experience as a narcotics officer, [that] he recognized this square object [felt on Williams] to be contraband," and, as a result, the officers had probable cause to search Williams and arrest him. Government's Resp. 14-15.

The Government further asserts that the pat-down of Berry was justified because Detective Cox felt objects during the search of Williams that he believed to be contraband. Based on the "detection of contraband on Williams, combined with Williams's [s]tatements and the actions of Berry," the Government maintains that the officers had "probable cause to arrest Berry and search him incident to arrest." *Id.* at 6-7.

### C.    Discussion

The court has carefully reviewed the evidence, the testimony, and transcript of the evidentiary hearing. The court's resolution of the Motions to Suppress turns in large part on the credibility of the witnesses. In assessing the credibility and believability of each witness, the court considered all of the circumstances under which the witness testified, including: the interest, if any, the witness has in the outcome of the case; the witness's appearance, demeanor, and manner of testifying while on the witness stand; the witness's apparent candor and fairness, or the lack thereof;

the reasonableness or unreasonableness of the witness's testimony; the opportunity of the witness to observe or acquire knowledge concerning the facts to which he or she testified; the extent to which the witness was contradicted or supported by other credible evidence; and whether such contradiction related to an important factor in the case or some minor or unimportant detail. Neither party disputes that Williams was subjected to a *Terry* frisk or that the packages located on his person were later confirmed to contain heroin, but they dispute whether the initial pat-down of Williams was justified under the circumstances. The parties also dispute whether the search of Berry's person was proper either under *Terry* or as a search incident to arrest.

All of the police officers present on October 28, 2013, testified at the suppression hearing except for Detectives Perez and Cerda. Detectives Martinez and Cox were the two officers with the most knowledge of whether reasonable suspicion existed for the investigatory detentions and pat-down searches of Williams and Berry. It was Detective Martinez, however, who made the actual decision, without consulting any of the other officers, to conduct the pat-down search of Williams when he did. Detective Martinez's testimony regarding the events that occurred that day and the video-taped recording of the brief encounter are key to the court's analysis, although it considered all of the officers' testimony.

As previously stated, the court's determination of the facts in this case turns in large part on the credibility of the police officers. Detective Martinez contradicted himself numerous times and was generally uncooperative and provided nonresponsive answers to straightforward questions on cross-examination regarding matters that he addressed on direct examination without hesitation. There were also inconsistencies between his and the other officers' testimony and the evidence regarding the sequence of events and other important matters that form the basis of whether reasonable suspicion existed for Detective Martinez to conduct a *Terry* frisk of Williams. These

inconsistencies undermine the officers' testimony and, as a result, the court questions and necessarily discounts that testimony. This, of course, is not to say that the officers were lying, but their inconsistent recollection of facts crucial to the court's analysis undermines the credibility of their testimony. The court fully realizes that the hearing took place almost five months after the incident and that the officers have had conversations and incidents involving other persons since that time; however, this is not a sufficient basis for the court to abdicate its responsibility to make credibility assessments and determinations.

In its closing argument, the Government contended that Detectives Cox and Martinez observed the following facts that justified the *Terry* frisks of both Williams and Berry: (1) the two men were traveling together; (2) they appeared nervous; (3) they were scanning the room; (4) they were communicating in nonverbal gestures after detecting that Martinez and Cox were police officers; (5) Williams was shifting his clothing in a suspicious manner; (6) the officers discovered (or mistakenly believed) after talking to Williams that he had a bus ticket in another person's name; (7) Williams became increasingly nervous and agitated during the consensual questioning; and (8) Williams put his hands in his pockets, looked over his shoulder, and stepped away from his bag after handing it over to Detective Martinez to be searched.

Regarding reasonable suspicion, the Government in its closing argument in response to the court's questioning, took the position that reasonable suspicion existed when Detectives Cox and Martinez first approached Williams and began talking to him or, at the latest, by the time the initial pat-down by Detective Martinez occurred. Detectives Cox's and Martinez's testimony regarding reasonable suspicion, however, was inconsistent. Detective Cox, initially testified that reasonable suspicion existed when Williams handed him a bus ticket with another person's name, but, after reviewing the video of the encounter, he acknowledged on cross-examination that Williams

explained the discrepancy by again providing his and Berry's tickets stapled together, which Detective Cox flipped through, and explaining that the ticket with Berry's name was his friend's ticket. Detective Martinez, on the other hand, initially *conceded on cross-examination and in response to repeated questioning by the court that, before Williams handed over his bag to be search, he was operating on nothing more than a "hunch" that the two might be involved in drug activity.* According to Detective Martinez, reasonable suspicion did not exist until seconds before the pat-down and takedown, and the presumed criminal or illegal activity that gave rise to the detention and pat-down search of Williams was Williams's failure to comply, during the consensual encounter, with police orders to keep his hands out of his pockets; Williams's refusal to cooperate during the pat-down; and Detective Martinez's belief that Williams had a weapon. *No mention was ever made by Detective Martinez at this time regarding reasonable suspicion of illegal drug activity, despite repeated questioning by the court.*

On redirect, however, after a fifteen-minute or so break, Detective Martinez did an about-face and testified in response to leading questions by the Government, to which objections were sustained by the court, that he had reasonable suspicion, based on the totality of circumstances, that Williams and Berry were drug couriers *before* Williams consented to the search of his bag. The Government attempted in its closing argument to downplay Detective Martinez's "hunch" testimony as being the result of defense counsel's persistent and "artful cross-examination." This may be so, but, as the court noted during the hearing, the officers should have anticipated that they would be questioned at length regarding reasonable suspicion for the detentions and pat-downs, and they should have been prepared to address it without difficulty and display a modicum of knowledge as to the parameters and meaning of reasonable suspicion.

Detective Martinez's testimony on redirect was a clear effort by the Government to rehabilitate a witness whose initial testimony did not factually or legally "cut the mustard" as to reasonable suspicion. Given Detective Martinez's considerable experience and training in narcotics (22 years), it only makes sense that he would possess adequate knowledge regarding the requirements for a *Terry* detention, that is, he certainly should have known that more than a hunch is required for reasonable suspicion, and he should know when a pat-down could be conducted. The court therefore believes that Detective Martinez testified truthfully prior to the Government's redirect examination when he said he had only a hunch that criminal activity might be afoot prior to the time Williams handed him his bag, as he and Detective Cox were the most knowledgeable on this issue.

Moreover, while the "hunch" testimony was initially elicited by defense counsel on cross-examination, the court subsequently questioned Detective Martinez at length to determine whether and when, in his mind, the conduct he observed gave rise to reasonable suspicion that criminal activity was afoot, as the court had concerns regarding the existence of reasonable suspicion. In particular, the court wanted to follow up on Detective Martinez's earlier testimony to determine what happened after Williams laid down the bag. Detective Martinez previously testified that prior to this time, he only had a "hunch" that criminal activity was afoot. The court therefore wanted to know what happened in that extremely short amount of time between when Williams laid down his bag and when the officers almost simultaneously did the pat-down and takedown. In other words, if Detective Martinez only had a "hunch" that criminal activity was afoot before Williams placed his bag on the ground, the court wanted to know at what point did the hunch morph into reasonable suspicion.

**Memorandum Opinion and Order – Page 16**

Most, if not all, of the court's questions were "softball" type questions.  Despite the court's straightforward questions and use of lay terminology, Detective Martinez still faltered and was unable to articulate until after the fifteen-minute recess what facts made him believe that Williams was a drug courier or engaged in other illegal activity.  Every time the court inquired about reasonable suspicion and suspected criminal activity, Detective Martinez testified about matters concerning officer safety rather than reasonable suspicion regarding criminal activity, that is, he stated that he thought Williams might have a weapon; that Williams reached for his pockets and waist; that Williams failed to comply with the officers' orders to stop putting his hands in his pockets; and that Williams resisted the pat-down.  As a result of this exchange, it became apparent to the court that Detective Martinez did not understand that reasonable suspicion must exist before a police officer can conduct a *Terry* pat-down or frisk notwithstanding whether an officer believes that a person may be armed and dangerous.[6]

Further, both he and Detective Cox acknowledged that they initiated the consensual encounter because they wanted additional information to determine whether Williams and Berry were drug couriers.  In other words, contrary to the Government's assertion, the police officers did not have reasonable suspicion that criminal activity was afoot at any time before following and confronting Williams.  If reasonable suspicion existed at that time, the police officers could have lawfully detained and patted down Williams, and they would have had no reason to initiate a consensual encounter and request Williams's consent.

When pressed by the court, however, neither Detective Martinez nor the Government could articulate to the court what happened in the few seconds after Williams handed over his bag that

---

[6] The court's questioning of Detective Martinez before and after the recess is located at pages 96 through 103 of the hearing transcript, the pagination of which may change slightly after the transcript is in final format.

caused Detective Martinez's knowledge to go from a hunch to a reasonable suspicion that Williams was a drug courier or engaged in other criminal activity.  Detective Martinez's testimony that Williams resisted the pat-down and might have a gun, simply stated, "puts the cart before the horse." The officers also contradicted themselves by testifying, on the one hand, that Williams was free to leave and decline a search of his person and bag during the consensual encounter, and on the other hand, by testifying that his refusal to consent to the pat-down and his vocal and physical resistance in this regard were "illegal," which gave rise to his detention, pat-down, and arrest.[7]

Unless a pat-down is consensual, before it can be conducted, a police officer must have reasonable suspicion that criminal activity may be afoot.  *Terry*, 392 U.S. at 7-8; *see also United States v. Jackson*, 390 F.3d 393, 399 (5th Cir. 2004), *vacated on other grounds*, 544 U.S. 917 (2005) (concluding that the *Terry* pat-down of Jackson was justified by reasonable and particularized suspicion that Jackson was a drug courier).  If the court were to accept Detective Martinez and the Government's position, every consensual encounter between the police and a citizen could readily be converted into a *Terry* stop if the citizen refused to comply with the police officer's requests or directives and was believed to be carrying a weapon.  Such a result would turn well-established constitutional jurisprudence on its face and defeat the basic and fundamental purpose of *Terry*, which is to ensure that police officers have objective, articulable facts that criminal activity is afoot *before* an intrusion is made on one's person.  *In other words, a determination that reasonable*

---

[7] Testimony regarding whether, when, and why Williams was arrested varied considerably. According to Sergeant Avalos, Williams was under arrest when he was forcibly taken down to the ground by the police officers and placed in handcuffs.  Sergeant Avalos testified that Williams was arrested for resisting the detention and pat-down, not because Detective Martinez felt an object on his person.  Detective Martinez initially testified similarly that Williams was arrested for resisting the pat-down, which he described as "a fight," although the evidence indicated that Williams's reaction in pulling away from the nonconsensual pat-down was actually defensive in nature.  Detective Martinez later testified that Williams was arrested for "carrying narcotics or suspicion that he was carrying narcotics," and that the "takedown" of Williams to the ground and his being handcuffed occurred because "he became combative [during the pat-down] and you cannot be combative and fight the police," but that Williams was merely detained at that point while a pat-down search of his person was conducted.

*suspicion of criminal activity exists must precede a pat-down; otherwise, police officers could pat*

*down any person without first establishing that objective articulable facts exist to show that criminal*

*activity is afoot.*

The detention of Williams occurred, and he was no longer free to leave, when Detective

Martinez ordered Williams to keep his hands out of his pockets – while standing in a "bladed" stance

with one hand on his holstered weapon – and informed Williams without asking his consent or

telling him he could refuse consent, that he was going to be patted down, despite Williams's

statement, "You are not going to search me!"[8]  *See Jackson*, 390 F.3d at 398-99 (concluding that

"when [Officer] Dunn conducted a pat-down search of Jackson in the baggage area, . . . the nature

of the encounter [which was initially consensual] began to take the character of a *Terry* stop").  "So

long as a reasonable person would feel free to disregard the police and go about his business . . . the

encounter is consensual and no reasonable suspicion is required." *Florida v. Bostick*, 501 U.S. 429,

434 (1991) (internal quotation marks and citation omitted).  Police, however, may not, "induce

cooperation by coercive means." *Jackson*, 390 F.3d at 397.  When the police convey the message

that compliance with their requests is required, an encounter is no longer consensual and reasonable.

*Bostick*, 501 U.S. at 437 ("As we have explained, no seizure occurs when police ask questions of

an individual, ask to examine the individual's identification, and request consent to search his or her

---

[8] The evidence is inconsistent as to whether any of the officers ever actually asked Williams whether he would consent to a pat-down of his person.  The report prepared by Detectives Cox and Martinez states: "Detective Cox asked Williams if Cox could search his person," and that "Williams stated angrily [in response that] "you can search my bag but you are not going to search me." Def. Berry's Mot. to Suppress, Ex. A at 1.  Detective Martinez, however, is the only officer who testified as to whether Williams was asked if he would consent to a pat-down of his person.  Detective Martinez initially testified that he advised Williams that he was going to be patted down for officer safety.  In this regard, he testified that he quickly approached Williams and told him, "We are going to search [you]." According to Detective Martinez, it was this directive that precipitated Williams's response, "You are not going to search me!," as well as the struggle that ensued after Williams made clear that he did not wish to be searched.  Detective Martinez later testified on cross-examination that he asked Williams whether he would consent to a search of his person, but reiterated that he informed Williams that he was going to be patted down.  Accordingly, Detective Martinez appears to contradict himself unless he informed Williams, after Williams refused to consent, that he was going to be patted down regardless of whether he consented.  *In any event, it is undisputed that Williams did not consent to the pat-down, and, due to Detective Martinez's directives, it was clear at this point that Williams was no longer free to leave.*

**Memorandum Opinion and Order – Page 19**

luggage—so long as the officers do not convey a message that compliance with their requests is required. Here, the facts . . . indicate that the officers did not point guns at Bostick or otherwise threaten him and that they specifically advised Bostick that he could refuse consent.”).

Here, Detective Martinez acknowledged that Williams was no longer free to leave when the decision was made to conduct the pat-down.  Moreover, when Detective Martinez ordered Williams to keep his hands out of his pockets and informed Williams that he was going to be patted down, despite his protestations to the contrary, a reasonable person would not have believed at this time that he or she was free to leave.  *See id.*  Immediately after Williams put his bag on the ground, Detective Martinez asked and then ordered him to keep his hands out of his pockets while pointing at and leaning towards him, and speaking to him in a commanding tone. When Williams failed to comply, Detective Williams informed him that he was going to be patted down, although Williams had made unequivocally clear that he would not consent to a pat-down.  During this exchange, both Detective Martinez and Sergeant Avalos had their hands on their weapons with Detective Martinez standing in a “bladed” stance.  All four officers then moved in quickly to surround Williams.  Thus, by their actions and commands, the officers conveyed the clear message that the encounter was no longer consensual, and Williams was not free to leave or disobey the officers’ directives.  Because the encounter was no longer consensual, reasonable suspicion of criminal activity was required to detain and pat down Williams.  *See Jackson*, 390 F.3d at 398-99 (concluding that although the initial encounter between the police and Jackson was consensual, the officers had constitutional authority to pat down Jackson for officer safety, even absent Jackson’s consent, because the officers had reasonable suspicion to believe the defendant was a drug courier and therefore believed that he might be armed and dangerous).

Even aside from Detective Martinez's testimony about having nothing more than a hunch and considering the facts relied on by the Government, the court determines that the officers did not have a reasonable suspicion, based on specific articulable facts, that criminal activity was afoot before detaining and patting down Williams.  The officers had only observed Williams for approximately five minutes total and had talked to him for less than two of the five minutes, which is much less time than the officer had to observe the defendant in *Terry*.  During the first two minutes, Detectives Cox and Martinez saw Williams and Berry enter the bus loading area together and noticed that Williams appeared nervous after realizing that Detective Cox, who was dressed in shorts and a T-shirt, was watching him.  During the hearing, Detectives Cox and Martinez testified that they also observed Williams shuffling his feet. On cross-examination after reviewing the video, however, Detective Martinez reluctantly acknowledged that Williams merely moved to get out of the way of the persons walking through the door at which he was standing near.  Based on the court's review of the video, it also finds that the movement of Williams's feet during this time was so slight as only to amount to shifting of his weight as the doors opened and closed, not shuffling, which suggests more movement.

In addition, Detectives Cox and Martinez testified that they observed Williams scan the bus loading area and make a head gesture to Berry. They observed the two men walk casually back into the terminal where Berry took off his coat and sat down, and Williams continued to walk just outside the main terminal door and pull out his cell phone.  Detective Martinez also testified that before Williams and Berry went back inside the bus terminal, "[W]e had to watch [them] because they were acting nervous." By "we," Detective Martinez was presumably referring to Detective Cox because he was the only other officer in close proximity to Berry and Williams.  Detective Cox, however, who was the closest to Berry, testified that the only thing he observed Berry do in the bus loading

area, that raised his suspicion, was to follow Williams back into the terminal after Williams nodded his head.

After approaching Williams and identifying themselves as narcotics officers, Detective Cox and Martinez observed that Williams was nervous but cooperative even after Detective Cox asked Williams why he was traveling under a false name. On direct examination, both officers testified that Williams only handed one ticket in Berry's name to Detective Cox, and that they did not determine until after the two were arrested that both tickets were stapled together or otherwise attached. On cross-examination, Detective Cox initially testified that he could not recall whether Williams had explained that he had two tickets – one with his name and one in his friend's Berry's name. After watching the video of the encounter, they both reluctantly acknowledged that Williams had provided his and Berry's tickets to Detective Cox and explained that the ticket with another name belonged to his friend Berry, who was sitting inside the terminal. To explain the discrepancy, Detective Cox testified that he did not believe Williams's explanation because in his experience drug couriers are generally not truthful,[9] and Detective Martinez attempted to minimize his involvement by testifying that it was Detective Cox, not he, who handled the tickets and talked to Williams.

Detectives Martinez and Cox also both testified that in their experience drug couriers travel together. Based on this testimony and the facts in this case, the Government contends that this factor or indicator supports a finding that reasonable suspicion existed. At the same time, the Government also contends that Williams's carrying a ticket in a different name was an indicator. These two factors or indicators, however, are mutually exclusive because, on the one hand, Detectives Cox and Martinez believed that Williams and Berry were traveling together; and, on the

---

[9] This testimony indicates that Detective Cox had already "branded" Williams as a drug courier, even though reasonable suspicion had not been established. Moreover, had Detective Cox bothered to examine the tickets, he would have readily discovered that Williams's statement was consistent with the documentary evidence.

other hand, they did not believe Williams's explanation that he had his friend Berry's ticket because they were traveling together.  To say that the officers believed both is inconsistent, and this causes the court to question the reasonableness of the officers' suspicion and conclude that the officers "jumped the gun" in patting down Williams before having sufficient facts to support a reasonable suspicion that criminal activity was afoot.  At most, what the officers observed up to this point with respect to Williams amounted to what appeared to be nervousness.  Nervous, evasive behavior is a pertinent factor in determining reasonable suspicion.  *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000).  Nervousness, without more, however, is insufficient to create reasonable suspicion of criminal activity even if the nervousness is extreme.  *Jenson*, 462 F.3d at 405-06 n.5; *United States v. Portillo-Aguirre*, 311 F.3d 647, 656 n.49 (5th Cir. 2002).

The Government also contends that reasonable suspicion existed for the search of Williams because he became increasingly nervous and agitated during consensual questioning.  Again, nervous, evasive behavior is one relevant factor in determining whether reasonable suspicion exists.  Contrary to Detective Martinez's and Sergeant Avalos's beliefs, however, it is not unlawful for a person to not cooperate with a police officer during a consensual encounter.  Absent reasonable suspicion or probable cause, a person is free to ignore the police when approached.  *Wardlow*, 528 U.S. at 125 (citing *Florida v. Royer*, 460 U.S. 491, 498 (1983)).  Thus, a "refusal to cooperate, without more, does not furnish the minimal level of objective justification needed for a detention or seizure." *Bostick*, 501 U.S. at 437.

Here, the timing of when Williams became visibly and audibly agitated is crucial, but the testimony as to when Williams's general nervousness escalated to agitation was somewhat inconsistent.  On direct examination, Detective Cox testified that Williams became agitated and his voice changed to an angry tone "as soon as we asked to search his bag!"  Detective Martinez, on

direct examination, initially testified that Williams became agitated after handing his bag over to be searched.  On cross-examination, however, Detective Martinez acknowledged that Williams's agitation coincided with his being informed that he was going to be patted down.  It was at this time, according to the officers, that Williams stated angrily: "You can search my bag, but you are not searching me!"  Under this set of facts, Williams's agitation occurred *after* he was detained, and it therefore cannot be considered in determining whether the officers had reasonable suspicion before detaining him.  When Detective Martinez told Williams that he was going to be patted down, he was detained because, as previously explained, no reasonable person would have thought that he was free to leave.

Finally, the Government contends that evidence that Williams put his hands in his pockets, looked over his shoulder, and stepped away from his bag after handing it to Detective Martinez supports a finding of reasonable suspicion.  The court disagrees.

First, with respect to Williams putting his hands in his pockets, Detectives Martinez and Cox did not testify that Williams's actions in this regard gave rise to reasonable suspicion of criminal activity.  They instead testified that Williams's putting his hands in his pockets after being directed not to do so by Detective Martinez caused them to be concerned for safety reasons.  Regarding Williams's looking over his shoulder and stepping back from his bag after handing it to Detective Martinez, both officers testified that Williams's conduct in this regard made them think that he was going to attempt to flee, just as they thought Williams's and Berry's going back inside the bus terminal was an indication that they might try to flee.  Sergeant Avalos similarly thought that when Williams looked over his shoulder, he was "eyeballing a potential escape route."

Unprovoked "headlong flight" is not necessarily indicative of criminal activity but may support a finding of reasonable suspicion in certain circumstances.  *Wardlow*, 528 U.S. at 124-26.

In this case, however, it is undisputed, that neither Defendant attempted to flee; rather, all that we have is the officers' concern that Defendants might try to flee.  Further, while Detective Cox testified that a person will normally only step back from a bag if he is trying to distance himself from illegal contraband in the bag, the officers' account of Williams's actions in stepping back from the bag after handing it over to Detective Martinez does not square with the video.

The video shows Williams taking two half-steps or "baby steps." The initial slight step backwards taken by Williams is in no way inconsistent with what a reasonable person would do in laying down a rolling bag with the handle extended.  Given the extremely short distance between Williams and Detective Martinez at the time, Williams could not have set the bag down in front of Detective Martinez without first stepping backwards slightly.  After the initial half-step backwards, Williams made another similar step backwards.  At most, this step appears to be one in which Williams adjusted his weight or posture.

In any event, a reasonable person would not view the second "half-step" as being threatening or consistent with a person who is about to flee.  After Williams took the second half-step backwards, a few seconds pass before he is taken to the ground; however, his right foot, which is barely visible in the video, does not move until he is thrown off his feet by the takedown.  It therefore strains credibility to assert that Williams's conduct in this regard could be interpreted as being indicative of someone who is engaged in criminal activity or consistent with the conduct of a person who is about to flee despite being surrounded by four police officers (Sergeant Avalos and Detectives Cox, Martinez, and Hussey).

Accordingly, considering the totality of the circumstances in this case, with the reasonable inferences to be drawn therefrom, the numerous inconsistencies in the testimony and evidence, and the determinations of the credibility of the witnesses, the court concludes that Detectives Martinez

and Cox did not have reasonable suspicion that criminal activity was afoot before detaining and patting down Williams. Moreover, the cases relied on by the Government are all factually distinguishable because, unlike those cases, there is no evidence in this case: that Defendants consented to the searches of their persons or were even asked to consent; that the police officers had received a tip beforehand that Defendants were suspected drug couriers or suspected of engaging in some other criminal activity; that Defendants paid cash for their tickets or that the tickets were for one-way travel; that Defendants had no identification on them; that Defendants were traveling to or from a destination that was a known drug source;[10] that Defendants were only staying a short time at their destination; that Defendants were traveling under assumed names; that the officers observed any suspicious bulges on Defendants before searching them; that Defendants voluntarily offered their bags to be searched before the officers asked for consent to search; that the officers

---

[10] In response to the Motions to Suppress, the Government asserts that Detective Cox asked Williams where he was traveling to and that Williams responded "Ohio." Government's Resp. 3.  There is no *evidence*, however, that Detective Cox asked Williams where he was traveling to or of Williams's response. Detective Martinez testified on cross-examination that he thought Detective Cox was aware of Defendants' bus travel destination, but he was unable to provide any specific details.  Detective Cox also acknowledged on cross-examination that Williams had two plane tickets that showed how he got to Texas from Ohio via Washington and Austin.  Detective Cox also testified that, in his experience, "some" of the buses at the Tornado bus station originate in Mexico and stop in cities in South Texas and Dallas before continuing north, and that this is a "drug smuggling route." Again, however, there is no evidence as to where Defendants were traveling or whether the bus they were traveling on originated in Mexico or another city known to be a drug source. The court therefore determines that Detective Cox's testimony – that some of the buses that depart from the Tornado bus station originate in Mexico – is not sufficiently specific or particularized with respect to either Defendant for purposes of reasonable suspicion.

obtained a search warrant prior to searching Defendants; that Williams was "pacing"[11]; or that Defendants took off in a "full sprint" after "making" the officers out to be police officers.

For the reasons stated by the court, the detention, pat-down, arrest, and subsequent search of Williams were unlawful.  Any and all incriminating evidence obtained by Dallas police on October 28, 2013, as the result of unlawful detention, personal body frisk, arrest, and subsequent search of Williams will therefore be suppressed.

Additionally, because the decision to detain and search Berry was based solely on the unlawful detention and pat-down search of Williams, the court will also suppress any and all incriminating evidence obtained by Dallas police on October 28, 2013, as the result of unlawful detention, personal body frisk, arrest, and subsequent search of Berry.  Regarding Berry, the court also reiterates that the only evidence regarding Berry's conduct came from Detective Cox, who testified that the only thing he observed Berry do that raised his suspicion was to follow Williams back into the terminal after Williams nodded his head.  Neither this fact nor the facts pertaining to Williams's conduct before he was detained, including that the two were traveling together, afforded the officers a particularized and objective basis for reasonable suspicion to believe that Berry was

---

[11] In its response, the Government contends that the pat-downs of Williams and Berry were justified in part based on *Jordan* and *Terry*, in which the defendants engaged in "ambiguous" conduct.  In *Jordan*, the defendant was observed "running at full sprint" away from a grocery store, and at "one point he tripped and fell to the ground, immediately got up and continued into a full sprint." *Jordan*, 232 F.3d at 450. The court in *Jordan* concluded that this conduct was not consistent with "recreational running" and was at least as ambiguous as the conduct in *Terry*, in which the defendants were observed for a period of time "pacing back and forth in front of a store, peering into the window periodically conferring."  *Id.*  As previously noted, there is no evidence in this case that the officers observed either Defendant running from the bus terminal, and the Government acknowledges in its response that Williams merely "shuffled his feet" while waiting in the bus loading area. Likewise, Detectives Cox and Martinez both testified that Williams was not pacing but that he instead merely moved or shuffled his feet slightly while moving out of the way of the bus terminal door as it opened and closed.  Moreover, the officers acknowledged that Defendants' conduct prior to the pat-downs was consistent with legal conduct, and, from the video, there does not appear to be anything overtly suspicious about Defendants' conduct as was the case in *Jordan* and *Terry*.  Accordingly, the cases relied on by the Government in which the defendants were "running" and "pacing back and forth" or acting in a manner that could be construed as "ambiguous" are of no assistance to the court.

committing a crime. *See United States v. Glass*, 741 F.2d 83, 85-86 (5th Cir. 1984).[12] Thus, despite the officers' testimony regarding their concern for safety, the seizure and searches of Williams and Berry did not comport with *Terry* and were unconstitutional.

Finally, because the court has determined that the Government's evidence is insufficient to support a finding that reasonable suspicion of criminal activity existed to detain and conduct a *Terry* frisk of Berry, the Government's alternate contention, that the same evidence is sufficient for probable cause to arrest Berry and search him incident to arrest, necessarily fails. *See* Government's Resp. 6-7 ("The detection of contraband on Williams, combined with Williams's [s]tatements and the actions of Berry, provided probable cause to arrest Berry and search him incident to arrest.").

## IV.     Conclusion

As the court has previously pointed out, there are multiple inconsistencies of importance that substantially undermine witness credibility. The position taken by the Government, in light of the evidence and the totality of the circumstances, is indefensible. The court therefore **concludes** that the Government has not met its burden and established that the heroin seized from Williams and Berry was *lawfully seized*, and **concludes** that the detentions, pat-downs, arrests, and subsequent searches of Williams and Berry violated the Fourth Amendment to the United States Constitution. Accordingly, the court **grants** Defendant's Motion to Suppress Unlawfully Obtained Evidence (Doc. 33) and Defendant's Motion to Suppress Unlawfully Obtained Evidence (Doc. 34); and **suppresses** all incriminating evidence obtained as a result of the detentions, *Terry* pat-downs, arrests, and

---

[12] In *Glass*, the court concluded that the following facts did not give law enforcement officers an objective basis for reasonable suspicion to believe that Glass had committed a crime: "(1) an El Paso DEA agent told agent Hawkins that two individuals of certain physical descriptions would be traveling to Shreveport, (2) Glass arrived on a flight from Ft. Lauderdale, a source city, (3) Glass and Flores recognized each other after deplaning, (4) Flores was travel[]ing under an assumed name and appeared nervous when questioned. . . . Glass produced a valid driver's license and a legitimate airline ticket. When asked if Glass did anything 'unusual' while walking down the concourse, Agents Hawkins and Pepper unequivocally answered no. Hawkins elaborated on his answer by saying that Glass 'proceeded in a direct manner' and 'occasionally' looked back in Flores's direction."

subsequent searches of Williams and Berry on October 28, 2013, including all drug evidence seized during the incident.  No evidence obtained as a result of the detentions, pat-downs, searches, or arrests of either Defendant may be used during the trial of this case.

**It is so ordered** this 9th day of June, 2014.

Sam A. Lindsay
United States District Judge